The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Haigh. The appealing party has shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives and amend the Opinion and Award. The Opinion and Award is affirmed and modified by changes in Conclusion of Law Number 1 and the Award Paragraph 1 as set forth herein.
 ***********
The Full Commission finds as fact and concludes as matters of law, the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The Employer-Employee relationship existed between the Plaintiff and the Employer-Defendant at the time of the alleged injury.
3. The Employer-Defendant is self-insured with Constitution States Servicing Company as the administrator.
4. Plaintiff's average weekly wage, as determined by the wage chart provided by Employer-Defendant, is $291.90, resulting in a weekly benefit amount of $194.60.
 ***********
Based upon the findings of fact found by the Deputy Commissioner, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff is a 57 year old female with an eleventh grade education. She is currently married and has been married for 32 years. Prior to working at WestPoint Stevens, Plaintiff worked as a meat wrapper at a grocery store for two years, at Warners, sewing bras, for less than a year, and at Blue Ridge Products, sewing cushions, for about two months. Plaintiff also did various sewing jobs at home during this time.
2. Plaintiff was hired at WestPoint Stevens' Longview plant on August 22, 1995. She was hired as sewer and sewed rug pockets on drapes.
3. On January 25, 1996, two maintenance employees, Johnny Moss and Steve Studer, were working on an aluminum light valence approximately ten feet off the floor. The fixture was to the side of Plaintiff's workstation. The valence, which weighed approximately three to five pounds, slipped from the workmen's hands and began to fall. According to Plaintiff, she had been leery of the fixture and was keeping her eye on it while the men worked. As the light fixture began to fall, it hit a rack which carried drapes and which was about seven feet off the floor. It then struck another rack of fabric approximately five feet off the floor. In addition to slowing down while hitting these racks, the valence was also slowed in its fall by the fact that its convex shape caught the air as it fell.
4. A portion of the valence then struck Plaintiff. According to Plaintiff, she raised her hand when she saw the fixture falling and the fixture struck her on the left front side of her head. This is consistent with the other witnesses, who testified that the fixture glanced off Plaintiff's left hand before glancing off the left front side of her head.
5. The testimony of Nurse Myra Coffey, and her nurse's log, show that when she examined Plaintiff immediately after this accident, Plaintiff had a contusion on the fingers of her left hand and a red spot the size of a nickel, but which was not raised, on the left front side of her head. According to Nurse Coffey, those injuries showed where the fixture hit Plaintiff's left hand before glancing off the front left side of her head.
6. Plaintiff testified that she immediately blacked out from the accident and slumped over her sewing machine. She recalls women screaming all around her. No other employees, including Plaintiff's witnesses, recall either of these facts. Sheila Monday, who worked about 25 feet away from Plaintiff, testified that she did not see the fixture fall, but heard it clang to the ground. When she looked up, Plaintiff was holding her hand to her head. Plaintiff was not bleeding, and did not lose consciousness at any time. According to Monday, Plaintiff was acting okay. Sonja Yoder testified that Plaintiff did not appear to lose consciousness.
7. Johnny Moss and Steve Studer, who were first on the scene, testified that Plaintiff did not slump over her machine and did not lose consciousness. These individuals were able to converse with Plaintiff and she was responsive, indicating no loss of consciousness. The undersigned does not accept as credible Plaintiff's testimony that she was rendered unconscious as a result of this incident based on the conflict of her testimony with all other testimony.
8. Billie Ross, Plaintiff's supervisor, arrived on the scene within a couple of minutes. Ross testified that when she arrived, Plaintiff was talking and lucid. Plaintiff was able to walk, without assistance, to Ross' office. Plaintiff was also able to assist in filling out an incident report. Because Plaintiff was feeling okay, she returned to her job. Plaintiff did not tell Ross she needed to see a doctor.
9. A little later in the day, Plaintiff was seen by Nurse Coffey, who examined her and checked her injuries. Afterwards, Plaintiff told Sheila Monday that she felt nauseated and had a headache. Monday testified that Plaintiff complained of no other health problems, other than a headache, after the day of the accident. Sonja Yoder testified that Plaintiff initially complained of headaches and dizziness the day of the accident, but only complained of headaches after that.
10. Plaintiff continued to work at her regular job from January 25, 1996 through February 29, 1996. At that time, she asked Sonja Yoder whom she used as a family physician. Yoder told her it was Dr. Scott Hoffman. Plaintiff did not seek medical attention through the plant nurse or the Employer-Defendant.
11. Plaintiff made an appointment on her own with Dr. Hoffman for February 20, 1996. He examined her and informed her that she needed to see a company doctor. Dr. Hoffman did not remove Plaintiff from work.
12. Plaintiff then saw Nurse Coffey, who arranged for her to see Dr. Robert Hart, an occupational medicine specialist. Plaintiff saw Dr. Hart the following day, on February 21, 1996. Dr. Hart made a preliminary diagnosis of traumatic migraine, prescribed medication and ordered a CT scan of the head. He returned Plaintiff to her regular job. Dr. Hart saw Plaintiff again on February 26, 1996. The examination showed no objective abnormalities. Furthermore, the CT scan was completely normal. Dr. Hart referred Plaintiff to Dr. Larry Boyles, a neurologist, based solely on Plaintiff's continued subjective complaints. Dr. Hart did not find any objective basis for removing Plaintiff from work.
13. Plaintiff was initially evaluated by Dr. Larry Boyles, a board certified neurologist, on February 29 and March 15, 1996. Plaintiff's neurological examination, which tested her for any evidence of brain or spinal cord injury, was completely normal. Dr. Boyles found no evidence of memory loss or conversation difficulties and the physical examination was normal. Dr. Boyles made an initial diagnosis of post-traumatic headache, but due to the normal examination, he could not offer this diagnosis with any degree of medical certainty.
14. On February 29, 1996, Dr. Boyles removed Plaintiff from work through March 18, 1996, as a result of her subjective complaints and her repeated statements that she could not return to work. There was no neurological reason Plaintiff could not return to work. Dr. Boyles found that Plaintiff's complaints were not debilitating.
15. Plaintiff did not return to work after her examination by Dr. Boyles. Instead, she was referred by her attorney to Jeffrey Ewert, a neuropsychologist. Plaintiff initially saw Ewert on March 28, 1996, and completed a portion of a neuropsychological examination. This examination was not completed until June 18, 1996. However, on April 2, 1996, Ewert wrote a letter to remove Plaintiff from work until he was able to complete his examination of her.
16. During the long delay in completing the psychological assessment, Plaintiff returned to Dr. Hoffman on May 7, 1996. Plaintiff presented to Dr. Hoffman with complaints of headaches and hypertension. The hypertension was unrelated to her accident or to her headaches. He provided her with medication and referred her to a neurologist, Dr. Menard. Dr. Hoffman's neurological examination was completely normal, indicating no brain injury. He also examined her neck and found it to be normal. In fact, Plaintiff never made any complaints of neck or back pain to Dr. Hoffman, either in February or May. Dr. Hoffman was quite clear in his opinion that he would not have expected Plaintiff to develop any neck or back problems as a result of her injury at work.
17. With regard to work status, Dr. Hoffman removed Plaintiff from work on May 7, 1996, solely until she could be evaluated by a neurologist. Nothing in Plaintiff's medical examination or physical condition caused Dr. Hoffman to remove Plaintiff from work. This was based solely on her subjective complaints.
18. Plaintiff first saw Dr. Dale Menard, a board certified neurologist, on May 15, 1996. Plaintiff complained to Dr. Menard of headaches, dizziness and numbness in her face. She made no complaint of neck or back pain. Dr. Menard made no objective findings during his examination to support Plaintiff's complaints. Dr. Menard diagnosed Plaintiff with post-concussive syndrome with vascular type headaches. He left her on medication designed to decrease her headaches. Dr. Menard opined that Plaintiff would not benefit from any further diagnostic testing and did not write Plaintiff out of work at this time.
19. Plaintiff returned to see Dr. Menard on June 12, 1996. Her complaints were unchanged. Dr. Menard changed medication to try to resolve her complaints. At this point, Dr. Menard wrote Plaintiff out of work until he could re-evaluate her in four to six weeks. Dr. Menard testified that he removed Plaintiff from work solely as a result of her subjective complaints since her neurological examination was completely normal.
20. On June 26, 1996, based on a referral from the Employer-Defendant, Plaintiff was evaluated by Dr. Thomas Gualtieri, a neuropsychiatrist in Chapel Hill, North Carolina. Dr. Gualtieri is a medical doctor, a psychiatrist who has practiced for 25 years and who has been board certified in psychiatry since 1980. He has specialized in neuropsychiatry, conditions affecting the brain, since he started on the UNC faculty in 1977. Dr. Gualtieri had Plaintiff's medical records form Drs. Hoffman, Hart and Boyles, and spoke to Dr. Menard via telephone, at the time of his examination of Plaintiff.
21. Dr. Gualtieri's examination of Plaintiff lasted approximately 3 hours. It consisted of a series of questions, followed by a physical and neurological examination, and finally, mental status testing, which includes tests for verbal fluency, memory, personality, sustained attention and reaction time.
22. Dr. Gualtieri's physical and neurological examinations were completely normal. Plaintiff had no reflex deficits and no problems with balance or coordination. Dr. Gualtieri also found no problems with Plaintiff's back, neck or spine as Plaintiff was completely flexible and had no stiffness or tenderness in her neck or spine. Dr. Gualtieri testified that the problems related to him by Plaintiff are inconsistent with the consequences of a mild head trauma and that in his opinion, to a reasonable degree of medical certainty, her complaints are not related to her incident at work. Dr. Gualtieri also testified that Plaintiff is not suffering from an adjustment disorder.
23. With respect to further medical treatment, Dr. Gualtieri determined that brain injury rehabilitation and cognitive therapy would not benefit Plaintiff and would make matters worse. As far as employability, Dr. Gualtieri testified that "On the basis of the consequences of the accident that occurred at work on January 25th, there is no psychiatric or neurological disorder which should prevent Ms. Lester from holding a job."
24. Based on Dr. Gualtieri's recommendation that Plaintiff could return to work, Employer-Defendant offered Plaintiff to return to her former job. Plaintiff did not return to the job and did not respond to the offer. According to Plaintiff, she did not return to work because Dr. Menard was keeping her out of work.
25. On July 23, 1996, Plaintiff returned to Dr. Menard. There was no change in her complaints. Dr. Menard makes no recommendations at this time, but he again keeps her out of work.
26. On August 13, 1996, Employer-Defendant's adjuster sent Dr. Menard a letter concerning Plaintiff's work status. Dr. Menard returned this letter with the notation "Per our discussion, I find no objective, quantifiable problems — subjective complaints are difficult to quantify. No reason she can't try going back to work, at least part-time." Dr. Menard testified that he felt Plaintiff was able to return to work.
27. Based on this release to return to work, the Employer-Defendant again offered Plaintiff to return to her former job. Plaintiff again did not return to work and did not respond to the offer to return to work.
28. In the interim, on August 20, 1996, Plaintiff was examined by Stephen B. Canner, a chiropractor, on a referral from Jeff Ewert. Plaintiff was complaining of headaches and "considerable left sided neck and upper shoulder pain since the accident." Canner found tenderness in the area of the cervical spine although examination of the lumbar spine, extremities, and neurological examination were all normal. Canner diagnosed a cervical and thoracic sprain/strain and removed Plaintiff from work through September 20, 1996. Canner treated Plaintiff three times a week from August 20 through the date of the hearing.
29. Plaintiff returned to see Dr. Menard on September 16, 1996. He found little change in her condition and did not revise his opinion that she was able to work. Instead, because Ewert and Canner were now providing her with treatment, and because he had nothing further to offer her, he turned her over to their care. Plaintiff did not return to Dr. Menard after the September visit.
30. However, on September 25, 1996, Plaintiff saw a third neurologist, Dr. Anthony Wheeler, located in Charlotte. She was referred by Jeff Ewert. Dr. Wheeler's musculoskeletal examination revealed no back or joint pain, stiffness, or swelling, with full cervical rotation and full range of motion of the shoulder. The neurological examination was completely normal. The only objective finding on Dr. Wheeler's examination was a tightening of the neck muscles. Dr. Wheeler testified that if this condition were related to the accident at work, he would have expected it to be present long before this. If it were not present previously, it would not be related to the accident at work.
31. Dr. Wheeler prescribed certain medications for help with the headaches. He also diagnosed a minor brain injury. At this visit, Dr. Wheeler did not write Plaintiff out of work, instead deferring to her attending physician.
32. Dr. Wheeler saw Plaintiff again on October 29, 1996, and there was no real change in her complaints or his opinion. He offered no new treatment plan and asked Plaintiff to return in six to eight weeks. Dr. Wheeler last saw Plaintiff on January 21, 1997. Dr. Wheeler noticed some improvement in Plaintiff's headaches but her examination was essentially unchanged. At this time, Dr. Wheeler defers to the findings of Jeff Ewert and, for the first time, removes Plaintiff from work until a reevaluation scheduled for March 1997. Dr. Wheeler has not seen Plaintiff since January 1997.
33. Plaintiff has been seen regularly at Carolina Neuroservices, which is owned by Jeff Ewert, since June 1996. During these regular visits, Plaintiff was undergoing biofeedback and relaxation techniques. Ewert also referred Plaintiff to a speech therapist and occupational therapist, who are also located with his practice. By January 1997, both therapists discharged Plaintiff from their care as having attained the expected results. In fact, Plaintiff did not actually go through much occupational therapy because when she first attended she was determined to be at functional levels. Finally, in a January 23, 1997 note, Ewert offers the opinion that at that time, Plaintiff could return to some form of gainful employment and the only thing preventing her from returning to West Point Stevens is the anger and animosity she feels toward the Company.
34. The undersigned finds that the testimony of Plaintiff as to her memory problems, attention deficits and headaches is not credible in light of the complete lack of credible medical evidence that she has any objective basis for those complaints. Furthermore, Plaintiff's testimony revealed that she is lucid, articulate and capable of recalling with specificity many facts and details concerning this claim. Plaintiff's demeanor and presentation at hearing rendered her subjective complaints not credible. Any symptoms from which Plaintiff is currently suffering or has had since February 29, 1996, are not related to her accident of January 25, 1996.
35. To the extent any medical professions relied on Plaintiff's subjective complaints to form the basis for their diagnoses and opinions, that medical testimony is also not accepted as credible.
36. Plaintiff's complaints of neck, shoulder and back pain are not related to her accident of January 25, 1996.
37. Plaintiff was not disabled at any time as a result of her accident of January 25, 1996.
38. The Employer-Defendant provided Plaintiff with appropriate medical treatment from Dr. Hart, Dr. Boyles and Dr. Gualtieri. All other medical treatment received by Plaintiff in this case was not authorized by the Employer-Defendant or the Industrial Commission and was not designed to provide relief or lessen symptoms resulting from her work related accident.
 ***********
Based on the foregoing Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. While Plaintiff suffered an accident at work on January 25, 1996, the accident did not result in any physical disability to Plaintiff. However, Plaintiff is entitled to benefits at a weekly compensation rate of $194.60 during the period from February 25, 1996, to March 19, 1996, during which time Dr. Boyles, to whom Employer-Defendant had sent Plaintiff, removed Plaintiff from her work while he assessed her condition. Although he ultimately found no causal relationship between her complaints and the accident, he did remove her from the workplace temporarily. N.C. Gen. Stat. § 97-29.
2. Any medical problems that Plaintiff is currently suffering from are not related to her accident of January 25, 1996. N.C. Gen. Stat. § 97-2(6).
3. Employer-Defendant is liable for medical treatment rendered by Dr. Hart, Dr. Boyles and Dr. Gualtieri. Employer-Defendant is not liable for medical treatment provided by Dr. Hoffman, Dr. Menard, Dr. Wheeler, Jeffrey Ewert, or Stephen Canner as that treatment was not necessary to treat any medical conditions related to Plaintiff's accident and because that treatment was not authorized by Employer-Defendant, which was providing appropriate medical treatment, or the Industrial Commission. N.C. Gen. Stat. § 97-25.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms and modifies the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at a weekly rate of $194.60 for the period from February 25, 1996, to March 19, 1996.
2. Defendant shall pay medical compensation for treatment rendered by Drs. Boyles, Gualtieri and Hart.
3. Defendant shall pay the costs.
This _____ day of June 1998.
 S/ _________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ __________________ THOMAS J. BOLCH COMMISSIONER
S/ __________________ CHRISTOPHER SCOTT COMMISSIONER
DCS/jlr